FILED 02 MAY '11 14:18 USDC-ORP

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Crim No. 10-339-HA |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| JEFFERSON BRYANT DAVIS, | |
| Defendant. | |

HAGGERTY, District Judge:

The government alleges that defendant Jefferson Bryant Davis unlawfully transported and trafficked a minor, "VCC," to engage in sex. Defendant filed a Motion to Suppress Evidence.

On April 7, 2011, this court issued an Opinion and Order suppressing all physical evidence, and any statements by VCC and "CM" (another minor), obtained on November 1, 2009. This court ordered VCC to testify at an additional evidentiary hearing on April 14, 2011 to resolve the remaining aspect of defendant's motion.

Prior to the hearing, the government requested that VCC be allowed to appear via video-conferencing. Defendant objected, arguing that the government's request was untimely, and that the affidavit offered by VCC's therapist, Shawn Coyne, Ph.D., should not be considered because she is unlicensed. After reviewing the record, the affidavit from Dr. Coyne, and briefings from both parties, this court granted the government's request.

1 - OPINION AND ORDER

Doctor Coyne is currently completing her residency requirements for licensure and is qualified to provide an expert opinion regarding whether there was a substantial likelihood that VCC would experience emotional trauma from testifying in court during the evidentiary hearing in this case. Moreover, Dr. Coyne's supervisor, Norm Reed, Ph.D., approved and signed the affidavit. The government's request was filed well before the trial date, and was submitted as soon as it was reasonably foreseeable prior to the evidentiary hearing, based on my order requiring VCC to testify. *See* 18 U.S.C. § 3509(b)(1).

At the hearing, defendant raised additional objections to the video-conferencing based on the Confrontation Clause and the statutory requirement that defense counsel be present in the room with the testifying child. Defendant's constitutional argument is foreclosed by the Supreme Court's holding in *Maryland v. Craig*, 497 U.S. 836 (1990). *See United States v. Etimani*, 328 F.3d 493, 499 (9th Cir. 2003).

Defendant's statutory argument is also rejected. Defense counsel did not make arrangements to be present in the room with VCC. Defendant, defense counsel, counsel for the government, the court, and observers sitting in the jury box viewed and heard VCC's testimony from individual monitors. The monitors utilized a picture-in-picture display in which the parties also saw VCC's view of the courtroom. VCC acknowledged that she could see and hear all parties. Defendant was able to confer with his counsel before and during VCC's testimony, and VCC was subjected to extensive cross-examination by defense counsel.

Following the hearing, this court received exhibits from the parties and a letter from defense counsel before taking defendant's motion under advisement. After reviewing the evidentiary record, this court DENIES defendant's Motion to Suppress Evidence [23] as to any statements made by VCC after April 1, 2010.

2 - OPINION AND ORDER

## BACKGROUND

This case originated from a high speed chase on November 1, 2009 between Portland Police Officer Gary Doran and defendant. After defendant was taken into custody, Officer Doran lawfully seized a cellular telephone from defendant's crashed car. Officer Doran then performed an improper warrantless search of the call records from defendant's phone, and answered an incoming call on the phone while he was driving toward the police precinct. The phone call led him to the Montavilla Motel, where he found two young girls, VCC and CM. The girls confirmed that they knew defendant. They did not make any statements regarding prostitution.

Almost five months later, on March 27, 2010, VCC voluntarily turned herself in as a runaway in California. She testified that she was exhausted with her situation, and wanted to escape physical abuse by defendant. She called 9-1-1 from her cellular phone near a McDonald's restaurant in Orange County. The police picked her up. VCC gave the police her true name and date of birth. Defendant was also in the vicinity, but VCC did not talk to the police about defendant.

The police transported VCC to a shelter where she was reunited with her parents. VCC did not disclose her involvement in prostitution to her parents. She was ashamed.

While away from home, VCC had contacted a friend through her cellular phone and told him that she was with a "pimp." The friend called her a "whore" and spread rumors at her school. VCC felt uncomfortable at home because of the rumors, and ran away again.

Salem Police Officer Stephen Chancellor received a description of VCC, and information that she might be located at a transit station. He found her there on April 13, 2010, told her that she was reported as a runaway, and asked her to accompany him to his office.

3 - OPINION AND ORDER

Officer Chancellor escorted VCC into a satellite office for the Salem Police department. He did not handcuff her, yell, or pressure her to talk. VCC sat on a bench in the office while Officer Chancellor updated her status in the law enforcement data system and contacted her parents.

Officer Chancellor read an "original" runaway report regarding VCC, and a "supplemental" report. The reports named defendant as a possible "suspect" because he may have taken VCC to California, and may have involved her in prostitution. Officer Chancellor had no information about defendant independent from the reports.

While Officer Chancellor entered data on his computer, he asked VCC about the circumstances that caused her to run away. She was initially guarded in her responses, but proceeded to share information with the officer. She discussed the rumors about her, told Officer Chancellor about using a false name, and admitted that she had given the false name to another officer the night before. After Officer Chancellor searched her false name in the database, he asked about her involvement in prostitution. She admitted that she had been arrested in several states for prostitution. During her numerous arrests, VCC had given her false name and date of birth to several police officers. She also gave the same false information to judicial officers.

Officer Chancellor mentioned defendant, and VCC told him about her relationship with defendant. She had not previously mentioned defendant's name to her parents or any other officer. Officer Chancellor never questioned VCC about the events at the Montavilla Motel, or any other event specific to November 1, 2009.

Prior to meeting Officer Chancellor, VCC had written a letter to her counselor describing her experiences after she ran away from home. In the letter, VCC references drug and alcohol use, prostitution, physical abuse from defendant, and her related emotions. VCC testified that

4 - OPINION AND ORDER

she possessed the letter when Officer Chancellor approached her, so she decided to speak with him because she "was going to talk to someone anyway."

Detective Jeff Staples requested that Officer Chancellor transport VCC to the Salem Police department so that he could interview her. She was handcuffed while in the car. The officers removed the handcuffs before she entered the interview room. Detective Staples was in plain clothes, did not have a gun, and did not pressure her to talk. Detective Staples never reviewed any reports regarding the Montavilla Motel, but had been advised that VCC was associated with defendant. During her interview, VCC described the last four months of her life. She gave her letter to Detective Staples.[1]

## DISCUSSION

This court must decide whether VCC's statements in April 2010 should be suppressed as fruit of the poisonous tree, following the unlawful search of defendant's phone on November 1, 2009. After considering the evidence, this court concludes that VCC's statements after April 1, 2010 were voluntarily made and are sufficiently attenuated from the illegal search to preclude suppression.

Evidence obtained as a result of unlawful police conduct should be suppressed unless the connection between the illegal search and the discovery of the evidence has "become so attenuated as to dissipate the taint." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (citation omitted). To determine whether the challenged evidence is sufficiently attenuated from the primary taint, the court must consider: (1) the temporal proximity between the illegality and

---

[1] At the hearing, VCC testified that she gave a copy of the letter to Officer Chancellor, not Detective Staples. However, defendant submitted a Property Report which indicates that Detective Staples took possession of the letter. The court has taken this discrepancy into account in weighing the credibility of VCC's testimony.

5 - OPINION AND ORDER

the discovery of evidence, (2) the presence of intervening circumstances, and (3) particularly, the purpose and flagrancy of the official misconduct. *United States v. Washington*, 490 F.3d 765, 776-77 (9th Cir. 2007) (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). The government bears the burden of establishing admissibility. *Washington*, 490 F.3d at 777.

If the challenged evidence includes live-witness testimony, a closer and more direct link between the illegality and the testimony is required. *United States v. Ceccolini*, 435 U.S. 268, 278 (1978). Testimony should not be excluded if the witness provided the statement by his or her own free will, and was not coerced or induced to testify based on the discovery of the tainted evidence. *Id.* at 279-80.

To determine whether the statement is sufficiently attenuated, the court must analyze four factors:

(1) the witness's stated willingness to testify;

(2) the role played by the illegally-seized evidence in gaining the witness's cooperation;

(3) the proximity between the illegal behavior, the witness's decision to cooperate, and the actual testimony at trial; and

(4) the police officer's motivation in conducting the search.

*United States v. Hooton*, 662 F.2d 628, 632 (9th Cir. 1981); *see also Ceccolini*, 435 U.S. at 278 (discussing whether the witness's testimony was an act of free will, whether the witness was questioned with the tainted evidence, whether substantial time had elapsed between the illegal search and the initial contact with the witness, whether the identity of the witness was known before the illegal search, and whether exclusion would have a deterrent effect).

Live witness testimony should be excluded if the government cannot establish evidence indicating that the witness made an independent decision to come forward to testify, or that the

6 - OPINION AND ORDER

witness would have been discovered independent of the illegal search. *United States v. Rubalcava-Montoya*, 597 F.2d 140, 143-44 (9th Cir. 1978). If evidence from the illegal search was used to persuade the witness to testify, then the court may infer that the witness's decision to testify was not voluntarily made. *Id.* In such a case, the government must prove that the officers would have likely asked the questions that prompted the witness's statements even absent the information obtained from the illegal search. *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1400 (9th Cir. 1989).

VCC was not known to the police before the illegal search of defendant's phone. However, five months passed between the events at the motel and her later statements to police. In *Ceccolini*, the Supreme Court held that a four-month break between an illegal search and a police officer's initial interview with a witness was a substantial enough period of time to purge the taint. *Ceccolini*, 435 U.S. at 269-72, 279 (noting also that a witness's testimony before the grand jury five to six months after the illegal search was sufficiently attenuated). Under the circumstances in this case, this court finds that a substantial period of time elapsed between November 1, 2009, and the time that VCC was first questioned by police on April 1, 2010.

When Officer Doran illegally searched defendant's phone, he was seeking evidence against defendant. Suppression in this case would therefore serve a deterrent effect. These factors weigh in favor of suppression.

The court also concludes that VCC provided her statements as an act of free will. VCC voluntarily notified the police of her whereabouts in California, and turned herself in as a runaway. She volunteered her true name and date of birth to the police. Although she did not disclose any prostitution-related activities to the police in California, or reveal her true name to

the police during her prior arrests, VCC testified credibly that she intended to talk to someone about her relationship with defendant at the time she made the challenged statements.

Alleged victims, in contrast to persons who are implicated in illegal activity, may be more likely to make an independent decision to testify. *Ramirez-Sandoval*, 872 F.2d at 1398 (citing *Satchell v. Cardwell*, 653 F.2d 408, 409-10 n.7 (9th Cir. 1981) (noting that a victim who was beaten and raped would likely go to the police eventually, or would have been inevitably discovered after she receives treatment for her injuries)). A thirteen-year-old alleged victim of sex trafficking and physical abuse may well be reticent to disclose the entire extent of her involvement to her parents, friends, or law enforcement officers. VCC explained that she wanted to talk to her mother, but was too ashamed to admit that she had engaged in acts of prostitution.

The court gives significant weight to VCC's letter. Even though VCC was mistaken about whether she delivered the letter to Officer Chancellor or Detective Staples, her decision to compose the letter at some point before she was interviewed by the officers evinces an independent willingness to make the statements at issue. VCC explained that she decided to tell Officer Chancellor the truth because she had already intended to tell someone. The fact that VCC gave the letter to Detective Staples and not Officer Chancellor does not diminish that she voluntarily spoke to Officer Chancellor.

VCC was never confronted with her earlier statements from November 1, 2009 during her interviews in April 2010. She was also never questioned about events that occurred at the Montavilla Motel. Instead, Officer Chancellor mentioned defendant's name because it was listed on the runaway reports. Perhaps VCC would not have made incriminating statements against defendant absent Officer Chancellor's mention of defendant. VCC's letter, however, identifies

defendant and describes her relationship with him. Under the totality of the circumstances, this court concludes that VCC would have inevitably discussed defendant with the officers.

Additionally, Detective Staples testified that the police obtained subscriber information for the phone number that VCC used to contact her friend. The phone number was registered to defendant, and was also linked to a magazine advertisement. Accordingly, the police had an independent means of connecting defendant to VCC regardless of the illegal search on November 1, 2009. The police likely would have asked VCC about defendant after they learned that she was contacting friends or family from a phone number registered to defendant.

In arguing for suppression of VCC's statements, defendant asks this court to follow an opinion from the District of Columbia Circuit. In *United States v. Scios*, 590 F.2d 956, (D.C. Cir. 1978), law enforcement agents illegally searched sixty file folders located in the defendant's home after the defendant had been arrested. *Id.* at 958. One of the folders contained various papers, including a credit card receipt for a motel bearing the defendant's name, and an itemized bill from the same motel indicating that "Mr. Massa" had registered for the room. *Id.* The agents issued a subpoena to require Massa to appear before the grand jury regarding the defendant's possible unlawful wiretapping. *Id.* Massa initially refused to testify, but later agreed after the prosecutor granted him immunity. *Id.* at 958-59. After the defendant was indicted, he moved to suppress Massa's testimony as fruit of the illegal seizure of the credit card receipt. *Id.* at 959.

The *en banc* court held that Massa's testimony was inadmissible because his decision to testify was "made solely to avoid being jailed for contempt." *Id.* at 961. The court noted that the taint from the illegal search had not dissipated because the agents were unaware of Massa's existence prior to the search, and because Massa agreed to testify only in response to official pressure, including the threat of a contempt citation. *Id.* at 963-64.

9 - OPINION AND ORDER

Defendant asserts that both factors in *Scios* are present in this case. This court disagrees. Although VCC was not known to the police before they encountered her at the Montavilla Motel, substantial evidence indicates that she made an independent decision to come forward, a decision that was free from official pressure.

Defendant suggests that VCC was induced to make statements against defendant because she had an outstanding failure to appear warrant for theft in Multnomah County, and had been advised by Detective Staples that he would interview her every time she ran away until she was honest with him. This alleged pressure is not tantamount to a subpoena and the threat of contempt that was present in *Scios*. VCC testified that she was never pressured by any of the officers, and that she voluntarily made the statements to Officer Chancellor and Detective Staples. In balancing all of the factors, this court concludes that VCC made an independent and voluntary decision to speak with the officers several months after she was identified as a result of an illegal search. On this record, the connection between the illegal search and her statements had "become so attenuated as to dissipate the taint." *Wong Sun*, 371 U.S. at 491 (citation omitted).

## CONCLUSION

For the reasons provided, defendant's Motion to Suppress Evidence [23] is DENIED IN PART. All statements by VCC after April 1, 2010 are admissible.

IT IS SO ORDERED.

DATED this 2 day of May, 2011.

Ancer L. Haggerty
United States District Judge

10 - OPINION AND ORDER